Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

Attorneys for Plaintiff
CENTER FOR COMMUNITY ACTION
AND ENVIRONMENTAL JUSTICE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE, a non-profit corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>NEWBASIS WEST LLC, a Delaware corporation,<br><br>        Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE ("CCAEJ"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean

COMPLAINT

1

Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On August 16, 2016, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CCAEJ's notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

5.     This complaint seeks relief for Defendant's discharges of polluted storm

water from Defendant's industrial facility located at 2626 Kansas Ave. in Riverside, California ("Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

## III.  PARTIES

6.     Plaintiff CCAEJ is a non-profit public benefit corporation under the laws of the State of California with its main office in Jurupa Valley, California. CCAEJ is dedicated to working with communities to advocate for environmental justice and pollution prevention. CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed. To further these goals, CCAEJ actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7.     CCAEJ has members living in the community adjacent to the Facility and the Santa Ana River Watershed. They enjoy using the Santa Ana River for recreation and other activities. Members of CCAEJ use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of CCAEJ use those areas to recreate and view wildlife, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CCAEJ's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will

COMPLAINT

redress the harms to Plaintiff caused by Defendant's activities.

8.    CCAEJ brings this action on behalf of its members.  CCAEJ's interest in reducing Defendant's discharges of pollutants into the Santa Ana River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CCAEJ.

9.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

10.    Defendant NEWBASIS WEST LLC ("NewBasis") is a corporation that operates the Facility that is at issue in this action.

## IV.    STATUTORY BACKGROUND

11.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

12.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

COMPLAINT

**General Permit**

14.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

15.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

16.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable

water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

17.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

18.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  *See* 1997 Permit, § A(2); 2015 Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit, §§ A(9), (10); 2015 Permit, § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit, Fact Sheet § I(1).

19.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a

description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations. See 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  See 2015 Permit, §§ X(G)(2), (4), (5).  Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

20.    The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and

discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id*.  The 2015 Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table.  *See* 2015 Permit, § X(H)(4), (5).

21.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility.  *See* 1997 Permit, § B(5).  The 2015 Permit now mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year.  *See* 2015 Permit, §§ XI(B)(2), (3).

22.      Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

23.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the

COMPLAINT

second half of each reporting year (January 1 to June 30).

24.     Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

25.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  Fact Sheet, Paragraph O.

26.     The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report").  1997 Permit, § B(14).  As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  *See* 2015 Permit, § XV.

27.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**Basin Plan**

28.     The Regional Board has identified beneficial uses of the Santa Ana

COMPLAINT

9

Region's waters and established water quality standards for the Santa Ana River and its tributaries in the "Water Quality Control Plan for the Santa Ana River Basin (Region 8)," generally referred to as the Basin Plan.

29.    The beneficial uses of these waters include, among others, groundwater recharge, water contact recreation, non-contact water recreation, wildlife habitat, warm freshwater habitat, and rare, threatened or endangered species. The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

30.    The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health."

31.    The Basin Plan includes a narrative oil and grease standard which states that "[w]aste discharges shall not result in deposition of oil, grease, wax, or other material in concentrations which result in a visible film or in coating objects in the water, or which cause a nuisance or adversely affect beneficial uses."

32.    The Basin Plan includes a narrative suspended and settleable solids standard which states that "Inland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses..."

33.    The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5…"

34.    The Basin Plan contains a narrative floatables standard which states that '[w]aste discharges shall not contain floating materials, including solids, liquids, foam

COMPLAINT

or scum, which cause a nuisance or adversely affect beneficial uses."

35.     The Basin Plan contains a narrative color standard which states that "[w]aste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses."

36.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; and iron – 1.0 mg/L.

37.     These benchmarks are reflected in the 2015 Permit in the form of Numeric Action Levels ("NALs").  The 2015 Permit incorporates annual NALs, which reflect the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.  The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L; O&G – 15 mg/L; and iron – 1.0 mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an

applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

38.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     <u>STATEMENT OF FACTS</u>

39.     Defendant NewBasis owns and/or operates the Facility, a 275,000 square foot industrial site located within the City of Riverside.

40.     The Facility falls within Standard Industrial Classification ("SIC") Code 3272.

41.     Based on CCAEJ's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and CCAEJ's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least four outfalls.  The outfalls discharge storm water and pollutants contained in that storm water to channels that flow into the Santa Ana River. Plaintiff is informed and believes and thereupon alleges that pollutants discharged from the Facility flow into the river at stretches identified as Reach 3 or Reach 4.

42.     Plaintiff is informed and believes, and thereupon alleges that the storm

water flows over the surface of the Facility where industrial activities occur including storage areas, casting stations, mixing areas, grinding stations, truck loading docks, shipping and receiving areas, and areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water discharge locations.

43.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

44.     There are no structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

45.     Since at least January 24, 2013, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board. Defendant certified each of those Annual Reports pursuant to the General Permit.

46.     In Annual Reports and storm water sampling results submitted to the Regional Board for the past four years, the Facility has consistently reported high pollutant levels from its storm water sampling results.

COMPLAINT

47.     The Facility has reported numerous discharges outside of the range of the numeric water quality standard for pH of 6.5 – 8.5 established in the Basin Plan. Defendant measured storm water discharges with a pH level below 6.5 on the following dates: January 5, 2016; September 15, 2016; December 2, 2014; and February 28, 2014.  These measurements have thus violated numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

48.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively, and the instantaneous NAL value for TSS of 400 mg/L established by the State Board.  For example, on September 15, 2015, the level of TSS measured by Defendant at one of its outfalls was 619 mg/L.  That level of TSS is over 6 times the benchmark value and annual NAL for TSS.  Defendant also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on March 11, 2016; January 5, 2016; December 12, 2014; December 2, 2014; November 21, 2013; February 8, 2013; and January 24, 2013.

49.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1 mg/L established by EPA and the State Board, respectively.  For example, on September 15, 2015, the level of iron measured by Defendant from one of its outfalls was 26.1 mg/L.  That level of iron is over 26 times the benchmark value and annual NAL for iron.  Defendant also has measured levels of iron in storm water discharged from the Facility in excess of 1 mg/L on March 11, 2016; January 5, 2016; December 12, 2014; December 2, 2014; February 28, 2014; November 21, 2013; February 8, 2013; and January 24, 2013.

COMPLAINT

14

50.     The levels of O&G in storm water detected by the Facility have exceeded the benchmark value and annual NAL for O&G of 15 mg/L established by EPA and the State Board, respectively.  For example, on November 21, 2013, the level of O&G measured by Defendant at one of its outfalls was 28.8 mg/L.  That level of O&G is almost twice the benchmark value and annual NAL for O&G.  Defendant also measured levels of O&G in storm water discharged from the Facility in excess of 15 mg/L on December 12, 2014.

51.     On information and belief. CCAEJ alleges that during the 2011-2012 wet season, NewBasis failed to collect and analyze samples from any storm water discharges from the Facility.  CCAEJ alleges that Defendant has failed to collect and analyze storm water discharges from the Facility the following dates:  October 5, 2011; November 4, 2011; December 12, 2011; February 15, 2012; February 27, 2012; April 11, 2012; and April 26, 2012.

52.     On information and belief, CCAEJ alleges that NewBasis is presently sampling storm water discharges from the wrong location, with respect to one of its outfalls.  The current SWPPP map for the Facility indicates that the storm water discharge point marked "X-4" is located in the northeast corner of Building No. 2.  However, a map included with the Facility's 2013-2013 Annual Report locates outfall "X-4" at the southwest corner of Building No. 1.  On information and belief, CCAEJ alleges that the northeast corner of Building No. 2 is not representative of the Facility's storm water discharges because this location fails to account for the storm water that flows past resin tanks, the grinding station, and hazardous waste storage – which are all areas of industrial activity.

53.     On information and belief, CCAEJ alleges that NewBasis failed to conduct monthly visual observations of storm water discharges during numerous months during the past five years.  Based on precipitation data compared to the dates in which the Facility did conduct monthly visual observation of storm water discharges, CCAEJ alleges that NewBasis failed to conduct monthly visual

COMPLAINT

15

observations of storm water discharges at its storm water discharge locations on numerous occasions.  CCAEJ alleges that Defendant has failed to conduct monthly visual observations of storm water discharges from the Facility on the following months:  October 2011, November 2011, December 2011, February 2012, April 2012, October 2012, December 2012, May 2013, October 2013, April 2014, November 2014, and January 2015.

54.     On April 27, 2015, and May 11, 2015, the Facility reported visual observations of storm water discharges, but, on information and belief, CCAEJ alleges that no discharges occurred at the Facility on those dates.  Therefore, CCAEJ alleges that NewBasis failed to conduct monthly visual observations at the Facility during those months.

55.     On information and belief, CCAEJ alleges that NewBasis has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete proper ACSCE Reports as well as proper Annual Evaluations for the Facility.

56.     On information and belief, Plaintiff alleges that since at least January 24, 2013, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, iron, TSS, O&G, and other potentially un-monitored pollutants. Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

57.     On information and belief, Plaintiff alleges that since at least January 24, 2013, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and

COMPLAINT

16

believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Section X(H) and X(E) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT.  The SWPPP map fails to identify the proper storm water discharge locations.  According to information available to CCAEJ, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

58.    Information available to CCAEJ indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events to channels that flow into the Santa Ana River.

59.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

60.    Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

61.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

fully set forth herein.

62.     The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, iron, TSS, O&G, and other potentially un-monitored pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

63.     Each day since August 18, 2011, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

64.     Defendant has been in violation of the BAT/BCT requirements every day since August 18, 2011.  Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

65.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

66.     Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water

COMPLAINT

Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

67.    Plaintiff is informed and believes, and thereupon alleges, that since at least February 28, 2014, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standard for pH in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

68.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pH, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated to channels that flow into the Santa Ana River, entering the River at either Reach 3 or Reach 4.

69.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

70.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

71.    Every day since at least February 28, 2014, that Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

COMPLAINT

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

72.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

73.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

74.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

75.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

76.     Each day since August 18, 2011, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

77.     Defendant has been in violation of the SWPPP requirements every day since August 18, 2011.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

78.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

COMPLAINT

20

79.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

80.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.

81.     Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to conduct proper monthly visual observations at the Facility and sample storm water discharges from the correct outfall at the Facility.

82.     Each day since at least August 18, 2011, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

COMPLAINT

1    e. Order Defendant to immediately implement storm water pollution

2  control and treatment technologies and measures that prevent pollutants in the Facility's

3  storm water from contributing to violations of any water quality standards;

4    f. Order Defendant to comply with the Permit's monitoring and reporting

5  requirements, including ordering supplemental monitoring to compensate for past

6  monitoring violations;

7    g. Order Defendant to prepare a SWPPP consistent with the Permit's

8  requirements and implement procedures to regularly review and update the SWPPP;

9    h. Order Defendant to provide Plaintiff with reports documenting the

10  quality and quantity of their discharges to waters of the United States and their efforts

11  to comply with the Act and the Court's orders;

12    i. Order Defendant to pay civil penalties of up to $37,500 per day per

13  violation for each violation of the Act since August 18, 2011 pursuant to Sections

14  309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 -

15  19.4;

16    j. Order Defendant to take appropriate actions to restore the quality of

17  waters impaired or adversely affected by their activities;

18    k. Award Plaintiff's costs (including reasonable investigative, attorney,

19  witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

20  § 1365(d); and,

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  

28  

COMPLAINT

1          l.   Award any such other and further relief as this Court may deem

2   appropriate.

3

4   Dated: October 17, 2016              Respectfully submitted,

5

6                                  By:   __/s/ Douglas J. Chermak_____

7                                        Douglas J. Chermak

8                                        LOZEAU DRURY LLP
                                         Attorneys for Center for Community Action

9                                        and Environmental Justice

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
                                    23